Good morning, Your Honors. Brian Dunn on behalf of the appellant, Edmon Washington. If it would please the Court, I would like to reserve five minutes to respond to counsel's argument. We begin with an analysis of what the Supreme Court has set forth regarding the use of the force that we have here. The use of a beanbag shotgun, or a projectile weapon that is capable of firing a less lethal round, is considered and has been considered by this Court to constitute a significant level of force. While it's not deadly force, it's right under deadly force. And when we think about a significant level of force, this Court has held it is a use of force which is capable of causing serious injury. In this particular case, we can't dispute that there was a serious injury. Mr. Washington lost the use of his eye. The beanbag was shot at his head. So there are four factors, based on the seminal case of Graham v. Conner, that are to be considered in evaluating the reasonableness of a use of force such as this. The first is, was there an immediate threat? Was there an immediate threat? Did the suspect pose an immediate threat? Here, as I'm sure the Court has reviewed the video, Mr. Washington has his hands clearly visible. He's not armed. The officer has testified that he wasn't perceiving any kind of bulge in his pockets to be consistent. With a firearm, his hands are up. His resistance would fall into the category of what is commonly called passive noncompliance. He is not obeying orders. That's undisputed. But in terms of what he's doing, he's not threatening anyone with a weapon. He has no weapon. And there's nothing that would be considered to be a threat of deadly force here. So when we look at the first factor, which is the immediacy of the threat, I think that there's definitely enough to go to the jury in this case, as the Court reviews this de novo. There's definitely enough to go to the jury as to whether or not we have a threat sufficient to justify this force. The second... Counsel, in your brief, you argue several times that Mr. Washington was unarmed and this is undisputed. He was unarmed. Of course, after the fact, they know that he's unarmed. But at the time, they couldn't see a weapon, but they couldn't also determine that that meant he was unarmed. Many of the commands were turn around, which he didn't do. And so he could have had a weapon. Conceivably, that's correct. Yes, and his waistband. So to say after the fact it was confirmed there was not a weapon on his person doesn't mean that the officers knew that at the time. I couldn't agree with you more. Okay. Which, and was the Court finished on that? So, you know, we're looking at the immediate threat and your argument is he was unarmed and he'd raised his hands. Well, that's in the context of the officers could not confirm that he was unarmed. It appeared to me watching the video, he raised his hands as he was gesticulating at the officers, but he was not obeying a command to raise his hands. He had his hands at his waist, which means if he did have a weapon in his waistband, he could reach for it. He was told more than 40 times to get down. He was told approximately 10 times to turn around. I mean, we're talking about commands in the number of between 50 and 100 commands that he didn't obey over seven minutes. He was standing next to the open car door of a heavily tinted window car, so they couldn't see what was in the vehicle. And on top of that, they knew he had been a few hours before walking publicly through the streets of Los Angeles, which appeared to be an AK-47, wearing tactical gear, camouflage and body armor, including a helmet and shouting threats at police officers. So they had all of this information beyond saying he raised his hands and he wasn't armed. I mean, is that a correct assessment of what the officers knew? Aside from the comments that he was threatening officers, everything else I believe is completely supported by the actual record. Well, he was saying he wanted to shoot somebody, right? I mean, no, he was not. Actually, I must correct the And I quote, I would blow their heads off. And he wasn't referring to a police officer in the mind of this particular officer that fired, Officer Olive. Officer Olive saw Mr. Washington as a 415 suspect. Okay, so a 415 can be a wide range of things, including combative. But the police broadcast that Officer Olive heard indicated that Mr. Washington could be dangerous to police officers. So he had been advised about, regardless if he said, I'm going to shoot police officers or I'm going to blow their heads off. The radio broadcast was he may be dangerous to police officers. I believe the precision of the analysis would dictate that the radio broadcast said that this was an ADW suspect, which was not the case. But of course, I will give the court complete discretion in terms of what the officer knew. And the officer necessarily did not know all of the details about what happened the night before. Remind me. Assault with a deadly weapon. Assault with a deadly weapon. That was what was being broadcast to Officer Olive and the others. Correct. The night before. And one of the interesting points that the court is raising is the issue of the crime having been committed the night before, but it wasn't being committed at the time of the weapon, at the time of the shooting. And when the court raises the issue of Mr. Washington's access to a weapon, what the officers knew versus the fact that he was unarmed and passively resisting, all of these things, Your Honor, support the argument that this should go to a jury. But Mr. Dunn, let me, let me ask you this. So let's just assume that they're on the facts you're taking in light most favorable to your client, that a reasonable jury could find a violation of the Fourth Amendment. Okay. But the district court here also granted summary judgment on the basis of qualified immunity. That's correct, Your Honor. So even if we assume, then the next question that we need to answer, or that you need to address, is, was the law clearly established regarding this violation? Absolutely. And for that, you know, we've been told on more than one occasion by the United States Supreme Court that we need to look at, you know, sort of the parameters of the incident that's in play. Absolutely. And we need to look at the state of the law at that time to see if a reasonable officer familiar with the law would understand that their actions under the circumstances would be violative of the Fourth Amendment. I hear the court loud and clear. Right? And so what do you rely on to tell us in this instance where there's passive resistance, there had been information about these weapons the night before that the officers were aware of, that he had been warned that if he didn't comply, they were going to use their, they were going to shoot him with a beanbag gun, whatever it was. I don't know if the factual record says that Mr. Washington heard that particular warning. Anyway, what law do you rely on to tell us that he should have known better and they shouldn't have shot, the officer, what's his name, shouldn't have used the weapon? There are three and only three cases, Your Honor, in the entire factual record that discuss the use of a less lethal projectile against an individual. There are only three. They are Diorre versus Rutherford. They are Glenn versus Washington County. And they are the district court case of Book versus County Fresno. In terms of the factual similarity, we're just not going to, in the history of American jurisprudence, find a situation where an individual is passively conducting a demonstration with the use of a firearm or with holding a firearm. That's something that's just not going to happen. What we look at is was the law sufficient to put these officers on notice? And what we have when we shave it down to the court, what I would present is we have an individual who's not actively resisting, who's not armed, who at the time of the shooting was not committing a serious crime, and at the time of the shooting was subjected to a significant level of force. Against the backdrop of those three cases, this is what we can conclude. If a person is passively noncompliant, not posing an immediate threat, and if that same person has not committed what would be considered a serious crime at the time of the shooting, and the serious crimes are defined by the California Penal Code very clearly, even the possession of a firearm illegally is not considered a serious crime. In all of those parameters, against the backdrop of those facts, the Ninth Circuit has held, as have the district courts, that the use of a less lethal round is not constitutionally permissible. Now, specifically, if you want to parse out the facts of those particular cases, in Diorley, which is the first case ever to discuss this, the suspect at various times during the incident had a hatchet. He had a knife at one point. He was holding lighter fluid. He actually wielded an unarmed, a crossbow that was not armed, and the suspect had a crossbow, and those are the kinds of weapons that the officers knew that he was capable of or had access to. He tossed aside each one. Exactly. Correct? He was holding lighter fluid at the time of the shooting. Right. He was approaching the officer, and as he was approaching, he had these very, he'd obtained possession of these various items, but at each time, at the instruction of the officers, he tossed or threw away each of these items Supporting the conclusion that, in this case, Mr. Washington didn't even have a weapon in the first place, in terms of what the officers saw. But what the officers knew was from what happened the day before, right? That's correct. And he was standing by the car, correct? Correct. And his hands were... They were doing this, Your Honor. Right. Occasionally. He was doing other things as well. I mean, he wasn't making any effort to comply with their commands. Even if he coincidentally raised his hands as he was gesticulating, you're not seriously arguing that he was obeying the commands he received. He's not obeying, but what I am arguing is that this Court has not said that you can shoot a man with a bean bag for not complying with orders. That's something that's pretty clearly been established by this Court. Well, other circumstances that the officers had to consider that are different from the cases you cite, the location. They're at a busy intersection. There's a school bus clearly visible on the video. There were multiple police cruisers there, perhaps eight. This went on for seven minutes. They knew the backdrop of what had happened a few hours earlier with him walking around what appeared to be an AK-47, which is a felony. And that seems different than the circumstances of an individual on private property who is mentally... I think there were mental illness issues with those individuals as well. Not in all of them. Mentally, they were drunk or impaired, but not mentally ill per se. I just want to, before... I want to address all of these points to the Court's satisfaction. We must remember that this is rule de novo, and the issue is as a matter of law. Can no jury, reasonable jury, conclude... No, there's two separate questions. First one is the constitutional violation. Correct. Could a reasonable jury find a constitutional violation? Correct. Just forget about the... That's a separate question. The question we then ask is, and it's a legal question, was the law clearly established such that a reasonable officer would have understood that under these general circumstances, use of the beanbag was a violation of the Fourth Amendment? I would point the Court... That's the second part of a qualified immunity analysis. Correct. And that's a legal determination. That is correct, Your Honor. That does not go to the jury. That is correct. And the issue is, I would point the Court to those three cases. If you look at the book case for Jim... If you look at, you know, okay, so you went through Delorey, and the other one was Glenn. I went through Delorey. Glenn versus Washington County. He was... No, if you look carefully at Glenn, in Glenn, we didn't even decide whether or not there was a constitutional violation. We said there was a critical tribal issue of fact that had to be decided before you could first determine whether or not there was a constitutional violation, and before you could even make a fair determination of whether or not there was qualified immunity, whether the law was clearly established. So Glenn really doesn't... Glenn just says there are some cases of excessive force that have to go... that it's appropriate to let... to reserve the qualified immunity determination until after some critical facts are answered by the jury. That's all that Glenn stands for. I have 47 seconds. I'll give you more time. Don't worry. Thank you, Your Honor. And I do agree with that. The record is sparse in this regard. But in terms of whether or not Officer Oliver's on notice, the issues in this case boil down to what was the threat that was posed, what was the type of resistance that was offered, what was the crime that he was alleged to have committed, and what were the circumstances facing the officer. Every case that we have establishes the principle that under those circumstances, the use of a less lethal round would not be appropriate. The Book case is probably the most on point. This is an individual that previously had been reported to have a 9-millimeter gun. He was a person that was not complying. He was at various times armed with various weapons. There was a perimeter set up. There were a lot of officers that were on the scene. And all of these issues were taken into consideration by the district court. The conclusion was that under those circumstances, a jury should be permitted to decide these things. And I understand the court's distinction. Qualified immunity is to be decided as a matter of law. But the issue is, in terms of what the Supreme Court has said, we're not going to find a case that is directly on point. No, and the court hasn't retreated from its one statement that you don't need a case on all fours, but you need to look at, we can't look at the right so generally, that there's a right to not to be subjected to excessive force. You have to sort of tailor it down to the circumstances. Correct. The red light is beeping. Yes. I'll give you a minute for rebuttal. Thank you so much, Your Honor. Good morning, Your Honors. Matthew Sherb on behalf of the City of Los Angeles and Officer Eric Olive. I'll start where my opposing counsel left off with the qualified immunity. Excuse him. Oh, sorry. Perhaps if I, I don't want to bang this, but. Thank you. Thank you, Your Honors. I would like to start where my opposing counsel left off, which is with the question of qualified immunity. And I think it's clear, as the court was pointing out, that these three cases cited, Book, which is only a district court case, Glenn, and Biorle, which are indeed Ninth Circuit cases, but simply determined that there was a question of fact in those circumstances. These cases really involve very, very different factors. There was no warning given before the shot. All of these were either, you know, in Book, it was a self-reported subject who said, you know, I'm calling 911. I'm suicidal. I want to be shot by cops. Glenn had a mother calling about her distraught and suicidal son, and Biorle had a wife calling about her husband. You know, these weren't people who were accused or thought of as committing crimes. The threats in those cases were well understood and contained. You know, it's a three-inch pocket knife in Glenn that it's quite clear that there's no threat to anyone else. And you have officers who have blown past a safety checkpoint and just gone on guns blazing and knew that the subject there didn't understand any of the commands because that subject said just before the shooting, why are you yelling? What's going on here? And in Biorle, a subject crossed this imaginary threshold, no warning, and an officer who provided information to his colleagues ended up firing at him. And then, you know, in the Book case where Salinas had self-reported himself as suicidal, again, he was in the very process of complying with the order to get out of this planter. He took one step in a non-threatening way. The officers could see he was unarmed. Nonetheless, not only was he shot with a less lethal launcher, but also with live ammunition and he was killed. So these cases are very, very different and they would not have put Officer Olive and the other officers with him on the scene on notice that there was a violation. This is really a tale of two suspects in this situation. You had Mr. Lindsey, who got out of the vehicle, complied with officer commands and made it safely to the side of the road, where you have Mr. Washington, who from the very get-go did not comply in this very tense situation. And, you know, the officers tried to manage this in the best way they could by giving commands, which were repeatedly not heeded. And then even so, five minutes or so into the process, it's very clear that now there's a 40 millimeter launcher on scene. Mr. Washington is being informed there is a launcher. We're going to need to deploy it. It's going to hurt. His response is to taunt the officers to shoot him through his dog tag. This is not passive resistance. This is now, it goes beyond that because it is a verbal signal that suggests that the subject is not going to be taken into custody without some intervention. And then towards the end of this process, again, 40 millimeter standby, 40 millimeter ready. This is your last chance. You can hear on Escalera's video at three minutes and 21 seconds. And then unfortunately, Mr. Washington doesn't comply and Officer Olive has to take that shot. And it's a single shot. And it's unfortunate that the projectile went where it did. But this is not a perfect world. You know, this is not, this is a scenario where, you know, there's some idea that there wasn't anything going on or he's a 415 suspect. But that term encompasses so much more than just not complying. It's competitive aggressiveness, as Officer Olive testified to. There's a couple of... Did the officers know that he didn't have any weapons in the car? No, the officers didn't know that until after the whole incident. What did they know about the weapon? They knew the day before that he'd been walking around. So right at three in the morning. So it's sort of the day before. It's that night they get these reports coming in. They know about the incident in Inglewood. They know that at that point they're walking around with illegal assault rifles. Then there's the whole series of radio broadcasts about what is going on in the parking structure. And what they know about that is Washington and Lindsey are getting out of cars. They're holding rifles in their hands as they're walking around the garage. There's a sense that, yes, somebody took a gun out of a car. But that's not to say that they got rid of the gun. It's merely that the officer, these subjects are now holding the guns. And in fact, as you look at the radio transcript that's at, I think, 4 ER up to about page 510, you see that really as that radio broadcast goes on, you keep hearing these are armed suspects. They're walking around the garage with the guns in hand. There's no indication at all in the record that when these gentlemen got back in their vehicle and started their drive, that they no longer had the guns. And I think the really key point here is that the police practices expert that Mr. Washington put forward in this case answered in his deposition that it was completely reasonable for the officers here to believe that Mr. Washington was armed at the time. And they had to act accordingly. And that's a serious threat. And so that's what gave rise to the situation here. And there's cases here that are much more on point than Glenn and Diorly and Rutherford, if we're looking back now at a more, if we're going to look at the constitutional analysis. And I don't think the court needs to go there. I think the court would be perfectly within its rights to say that this is a simple case of qualified immunity, given the lack of convergence between Glenn and Diorly and the facts of this case. And, you know, we're not going to reach the constitutional issue. But if the court goes there, you know, this is this case is much more like something like the Miller case, Miller versus Clark County, that we cited in our brief, where there's, you know, knowledge of this past felony crime. In that case, it was the fleeing police had taken place longer in the past than the crime here had taken place. And, you know, the officers came across a knife on the seat of a car. They therefore are allowed to infer that there is possession of a weapon, perhaps one more dangerous than a knife. The officer in that situation needed to let loose a dog who went off into the woods to place a bite hold on that subject. And the court said, you know, look, this is in this situation, given the known threat, this is an appropriate use of force. And it's similar to the Blanford case that we cite. And, you know, there's other cases involving tasers. Now, this is not a taser case, but, you know, this is this is a case that called for some measure of force. And if you look at the case, you know, Bryan versus McPherson, that distinguishes this 11th Circuit case, Draper versus Reynolds, which basically, you know, this Bryan versus McPherson versus the Draper Reynolds distinction, it really sort of illustrates how the line, even in those cases, was fuzzy between force being constitutional and not. And in the 11th Circuit case that Judge Wardlaw distinguishes in Bryan versus McPherson, what happens is you have a really trivial traffic stop for a traffic violation. A gentleman gets out of the car, comes to the back of the car. The officer interacts with him, says, you know, sir, you need to get your driver's license and registration. That command is ignored four times in an argumentative fashion. And the officer in that case is forced to deploy a single taser blow to that to that subject. And the 11th Circuit said that in that situation, that that level of force was useful. And it's, you know, similar. Also, we have, you know, the Falarka case, which deals with the protesters at the Occupy Berkeley. Now, that's a different, totally different kind of scenario. But again, it's a situation where there isn't maybe that one moment to reach a grab or something, but there's a need to handle the situation with a modicum of force that's appropriate to the situation. And the two 8th Circuit cases that we cited is sort of analogous here. The Brassard versus Jahnke and Cravener versus Schuster are similar in that regard. And I think when you look at those cases about taser use and you look at the facts that were known to the officers in this case, the conclusion has to be that the conduct here did not violate the Fourth Amendment. How about the argument would have to be that no reasonable jury could find. That's that's right, Your Honor. Find a use of excessive force on these facts. That's right, Your Honor. The light was favorable. I certainly agree with that. But as you said, it's under the framework that the Supreme Court has laid out. We don't necessarily have to address that constitutional question. That's right, Your Honor. In this case, maybe assume that there's a violation that goes straight to the qualified immunity. Sure. And I think that would be an appropriate way of handling this case, especially given how many different factors are in play here. It might be the court may decide that it's better to address this as simply a prong to qualified immunity analysis. Real quickly, I just wanted to make sure there are two facts were clear. It is, in fact, the case that Officer Olive heard the suspects had, quote, threatened to shoot any PD. That's 3 ER 213 to 14 paragraph 9. And in the transcript, the radio transcript at 4 ER 505 and 508 to 509. And that Mr. Olive, I'm sorry, Mr. Washington did, in fact, know that he was about to be shot with a 40 millimeter and that it would hurt. He he understood that the officers were preparing to fire a round. And this is at 3 ER 252 paragraphs 45 and 46. I want to make sure that I've addressed all of the panel's questions. But if there are not others. I think so. Thank you very much. OK, Mr. Now, we put a minute up there for you to make a quick response. I'll be quick, Your Honor. Thank you very much. I'd like to direct the court to the Ninth Circuit ruling of Robinson versus Solano, Solano County. The issue was discussed as to an individual that had a shotgun that had discarded the shotgun. The court very clearly held that if a person once has a gun and discards the gun, that that does not justify a significant level of force. It specifically addressed this issue, which seems to be troubling the court. If there is a suspect that uses a weapon that is no longer carrying that weapon, the prior use of a weapon does not give the give rise to the type of analysis that would support a significant level of force. There is a factual dispute as to what officer Olive knew vis-a-vis what Mr. Washington said in his deposition. He said that he did not believe that the statement, I'm going to blow their heads off, was applicable to him or any other police officer. That's a factual dispute. With regard to the officer's perception, I will leave the court with the fact that everything governs from that. This officer believed he was dealing with a 415 suspect, which is not anywhere near the realm of a felony. And I'm out of time. Thank you, Mr. Dunn. Thank you, Your Honor. I appreciate your arguments, counsel, both counsel, the matter submitted at this time.
judges: Kelly, Paez, Bade